# EXHIBIT A

| | | |
|---|---|---|
| ROBERT CANDY<br>10105 Cottage Inn Lane<br>Cumberland, Maryland 21502 | * | IN THE |
| | * | CIRCUIT COURT |
| and | * | FOR |
| ANIMAL PARK, CARE AND RESCUE, INC.<br>10105 Cottage Inn Lane<br>Cumberland, Maryland 21502 | * | ALLEGANY COUNTY, |
| | * | MARYLAND |
| and | * | |
| | * | Case No. _____ C-01-CV-18-000253 |
| TRI STATE ZOOLOGICAL PARK OF<br>WESTERN MARYLAND, INC.<br>10105 Cottage Inn Lane<br>Cumberland, Maryland 21502 | * | |
| | * | |
| Plaintiffs | * | |
| v. | * | |
| PEOPLE FOR THE ETHICAL<br>TREATMENT OF ANIMALS, INC.<br>501 Front Street<br>Norfolk, Virginia 23510 | * | |
| | * | |
| Serve On:<br>Ingrid E. Newkirk<br>501 Front Street<br>Norfolk, Virginia 23510 | * | |
| | * | |
| and | * | |
| BRITTANY PEET<br>c/o the PETA Foundation<br>1536 16th Street, NW<br>Washington DC 20036 | * | |
| | * | |
| and | * | |
| HOLLY BROWN<br>Address unknown<br>Believed to reside in<br>Towson, Maryland | * | |

1

| | |
|---|---|
| And | * |
| CASEY BROWN<br>Address unknown<br>Believed to reside in<br>Towson, Maryland | *<br>*<br>* |
| and | * |
| KRISTINE STASER<br>Address Unknown<br>Believed to reside in Ohio | *<br>* |
| and | *<br>* |
| DELCIANNA WINDERS<br>c/o PETA Foundation<br>1536 16th Street, NW<br>Washington, DC 20036 | *<br>* |
| and | * |
| COLIN HENSTOCK<br>501 Front Street<br>Norfolk, Virginia 23510 | *<br>* |
| and | * |
| CHRIS FONTES<br>501 Front Street<br>Norfolk, Virginia 23510 | *<br>* |
| Defendants | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

Now Come the Plaintiffs, by and through their undersigned counsel, Nevin L. Young, and sue the Defendants, and state:

## FACTS COMMON TO ALL COUNTS

### Parties and Jurisdiction

1. The Plaintiffs are a Maryland individual, a Maryland Limited Liability Company in good standing, and a Maryland Corporation in good standing, all being residents of Allegany County, Maryland.

2. The Defendant People for the Ethical Treatment of Animals, Inc. (hereinafter, PETA) is a Virginia Corporation headquartered in Norfolk, Virginia.

3. The Defendant Kristine Staser is an individual who, upon information and belief, resides in Ohio based upon her own statements on her page on a social media site known as Facebook. She claims on that same page to be an "undercover agent" for PETA.

4. The Defendants Brittany Peet and Delcianna Winders are attorneys for the Defendant PETA, Inc., although they are believed to be employed by a non-Defendant entity known as the PETA Foundation.

5. The Defendants Casey Brown and Holly Brown are "volunteer" investigators who worked on a casual basis in conspiracy with the other Defendants, in violation of law, to injure the Plaintiffs' business interests and to defame the Plaintiffs.

6. The Defendants Colin Henstock and Chris Fontes are "investigators" who work for the Defendant PETA to unlawfully infiltrate facilities they claim are abusing or neglecting animals.

### Summary of Facts

7. Defendant PETA is an animal rights activist group that most persons would consider radical. They espouse a philosophy that no animal should be eaten, worn, exhibited, or used for entertainment.

8. For at least 20 years, PETA has engaged in activity throughout the country aimed at advancing their philosophy. They have engaged in press campaigns and protests against zoos, circuses, fur sellers, supermarkets, butcher shops, and a variety of other industries that are incompatible with PETA's central tenets.

9. PETA also uses its activities to raise funds from persons who may be sympathetic to its cause. PETA has annual revenues of approximately $48 million dollars in 2017, but annual operating expenses of approximately $67 million, which caused a significant drop in assets for the corporation.

10. One of PETA's many activities is to engage in litigation against those who offend the core tenets of PETA. PETA has sued the Miami Seaquarium unsuccessfully, and has also sued a large number of smaller zoos, circuses, and other animal exhibitors, with varying levels of success. PETA also sued a photographer in an attempt to establish copyright rights for a macaque that took a "selfie" photograph with a photographer's camera.

11. Among the many smaller zoos that have become targets of PETA's activism is Plaintiff Tri-State Zoological Park of Western Maryland, Inc. (hereinafter, "Tri State").

12. Plaintiffs Tri State and Animal Park, Care and Rescue, LLC (hereinafter, "Animal Park") are the creation of Robert Candy, who started and

4

primarily operates the companies as a way to rescue, care for, and exhibit animals at a small facility in Cumberland, Maryland.

13. Over the last several years, agents of PETA, at the time unidentified, have entered the Plaintiffs' facility for the purpose of taking photographs designed to cast the facility in the most unflattering light possible, and have entered while not identifying themselves despite a sign that clearly states that anyone affiliated with PETA must identify themselves before being admitted.

14. On multiple days in 2014 and 2015, Defendants Colin Henstock and Chris Fontes, as well as another person not yet a defendant in this action, entered the Plaintiffs' facility while it was closed for the season, by pretending to be there as *bona fide* volunteers interested in helping the Plaintiffs by cutting wood, cleaning, and doing general repairs. They lied about where they were from, saying they were from Hagerstown, which was false. They also directly lied when Plaintiff Robert Candy asked them if they were with any sort of animal rights organization.

15. Contrary to the false representations of the Defendants, the Defendants arrived at the zoo with hidden cameras and hidden audio recording devices in order to conduct an "undercover investigation" on behalf of Defendant PETA.

16. The Defendants Colin Henstock and Chris Fontes, as well as a third individual not yet named, therefore trespassed by false pretense upon the property of the Plaintiffs.

17. PETA has made numerous meritless complaints to the United States Department of Agriculture's APHIS (Animal and Plant Health Inspection Service),

5

and has made meritless complaints also to the Animal Control authorities of Allegany County, falsely alleging animal cruelty.

18. Most of the complaints made by PETA are meritless and PETA is aware that those complaints lack merit, but PETA uses its campaign against the Plaintiffs as a fund raising mechanism.

19. The Defendants Chris Fontes and Colin Henstock, as well as a third individual not herein identified, not only made surreptitious video footage of the Plaintiffs' facility, but also made illegal audio recordings of Plaintiff Robert Candy and a volunteer at the facility, Kathy Moran. Those illegal audio recordings constituted and still do constitute a felony criminal offense in the State of Maryland.

20. Defendants Chris Fontes and Colin Henstock were sent to the Plaintiffs' facility by in house counsel for PETA, Brittany Peet and Delcianna Winders, both licensed attorneys but upon information and belief, not licensed to practice law in the State of Maryland. Defendants Peet and Winders either instructed Defendants Chris Fontes and Colin Henstock to make illegal and/or tortious audio and video recordings of the Plaintiffs' facility, or, upon discovering that they had done so, ratified such acts on behalf of Defendant PETA and decided to make use of the illegally and tortiously obtained material. Defendants Peet and Winders further knew that Defendants Henstock and Fontes would be entering onto the premises under fraudulent pretenses.

21. Contrary to law, and in violation of their duties as attorneys not to advocate, direct, or conspire in illegal activities, the Defendants Peet and Winders sent Defendants Henstock and Fontes to conduct an illegal investigation of the

Plaintiffs' facility. There may have been other PETA attorneys involved but discovery will be required to determine if additional defendants should be made parties to this case.

22. The Defendants Chris Fontes and Colin Henstock also specifically attempted and partially succeeded in receiving a tour of the areas of the zoo where the general public is not usually allowed. They took secret video and audio of those visits in the employee areas of the zoo for the specific purpose of later using the footage obtained to make a public safety complaint to the USDA APHIS service, which licenses facilities that exhibit animals.

23. Upon information and belief, Defendants Peet and Winders specifically knew or should have known that the activities of Fontes and Henstock were illegal, and used that illegally obtained evidence to make a complaint to the USDA APHIS service.

24. The Plaintiffs herein were not aware of the extent of the surveillance or the fact that the "volunteers" Henstock and Fontes were employees of PETA until after PETA filed Endangered Species Act litigation in the United States District Court of Maryland in 2017, and only discovered the illegal audio recording and the agency relationship of Henstock and Fontes in April, 2018, through discovery produced during that lawsuit, which discovery is still the subject of an ongoing dispute, and may ultimately produce evidence of further illegal activity.

25. The Defendants have further engaged other persons such as Defendants Holly Brown and Casey Brown. Upon information and belief, the Browns

were volunteers who were asked to act as investigators and were compensated or reimbursed for expenses.

26. Upon information and belief, Holly Brown and Casey Brown are not licensed as private investigators, but were required to be so licensed by the laws of the State of Maryland, therefore, committed a criminal misdemeanor by undertaking an investigation of the Plaintiffs' facility.

27. During 2017, Defendants Brown visited the Plaintiffs' facility under false pretenses and took photographs of Mbube, a beloved member of the zoo, who was stricken with a pituitary tumor or other condition causing Addison's Disease, which caused an emaciated condition. The lion was under the care of a veterinarian and was being treated with testosterone and other medications to see if he would respond to that treatment and begin to regain weight. PETA complained to the USDA APHIS service, and a direction was written to obtain a second opinion from a large cat expert. Due to that direction by the USDA, the lion was tranquilized, samples were drawn, and those samples confirmed the original diagnosis. Nothing was gained other than further trauma and distress to the lion, caused by PETA.

28. A short time later, the lion was euthanized due to his illness.

29. PETA did not honestly represent what had happened to Mbube, but to make maximum fundraising gains out of the incident, dishonestly represented what had happened on its website.

30. PETA published a photo of the lion in an emaciated condition, taken surreptitiously by an undercover agent believed to have been Defendant Brown, and made numerous false statements about the lion and the treatment it had received by

8

the Plaintiffs, stating, among other things, that the zoo had failed "to provide an ailing, dramatically underweight lion named Mbube with adequate veterinary care." In fact, the USDA did not cite the zoo for failing to provide adequate care, but simply wanted the zoo to seek a second opinion before euthanizing the lion, due to the fact that PETA had made a complaint.

31.   PETA has a long history of mischaracterizing inspection reports by the USDA APHIS service as "citations" even when deficiencies noted on those forms are given a time frame for correction, and are not fineable or even subject to adjudication unless the facility fails to correct the noted condition.

32.   PETA further claimed that "[a]t Tri-State, two ring-tailed lemurs are kept in a woefully inadequate enclosure devoid of any environmental enrichment. Social animals by nature, they are deprived of appropriate companionship, and their living conditions are unsafe and unsanitary." Those statements about the care and safety of the lemurs were completely false.

33.   PETA further claimed that "[f]ive tigers are kept at this roadside zoo in decrepit enclosures without proper enrichment, food, potable water, shelter, or sanitation. Free-roaming animals expose them to the risk of diseases, and staff force them to engage in inappropriate and dangerous interactions with the public. In addition, three of the tigers—Kumar, Cayenne, and India—are housed together despite evidence of incompatibility, which causes them significant stress and puts them at risk of injury."

34.   Almost every word of the statement in paragraph 31, above, was false at the time it was written and remains false to this day. The tigers have adequate

enclosures, water, food, and sanitation. The free roaming animals around Tri State are no more of a problem than at any other zoo or animal refuge. The animals are not forced into dangerous and inappropriate interactions with the public. Furthermore, the three tigers housed together have never shown any evidence of incompatibility, after eleven years in the same enclosure with one another, and even after having been raised together since birth.

35. PETA further published on its website "[s]ince the death of Mbube, another lion named Peka has been held at the zoo in complete isolation, which is particularly harmful since lions are social animals. Like the other animals imprisoned at this zoo, Peka doesn't receive proper enrichment, food, shelter, housing, or sanitation, and she, too, is forced into unnatural interactions with visiting tourists."

36. The statement above, in paragraph 33, is likewise false in many of its elements, and makes misleading and material omissions in other ways. For example, it is completely false that Peka does not receive proper enrichment, food, shelter, housing, or sanitation, or that she is forced into unnatural interactions with visitors. While it is true that she is now the only lion at Tri State, PETA neglects to state why—it is because PETA had been threatening to file a lawsuit under the Endangered Species Act in the United States District Court in Baltimore, and it made no sense to the Plaintiffs to obtain another lion while that lawsuit was pending. Further, there is no legal requirement that a lion be grouped with other lions.

37. PETA furthermore engages in inflammatory rhetoric through social media and its email lists, and as a result, Plaintiff Robert Candy has received

telephone calls and letters accusing him of all manner of animal cruelty. The Facebook page for Plaintiff Tri-State Zoological Park contains many positive reviews, but mixed among them are vehemently profane and negative reviews, one of them even coming from someone who admits to never having been to the Tri State Zoo, and who does not live in the United States, but states that the zoo has a worldwide reputation for being a dirty place with starving animals. No animal has ever starved at Tri State Zoo.

38. One person, who identifies herself on the Facebook social media site as Kristine Staser, Defendant herein, states that she is an undercover agent for PETA, and as to Tri State Zoological Park, says the following on Tri State Zoological Park's Facebook page [with expletives partially stricken from the original]:

*"A lion DIED there from lack of veterinary care and starvation!! Are you people that selfish to continue to pay GREEDY A\*\*HOLES worth of toxic waste money so animals are available for YOUR selfish entertainment and amusement??? Deplorable conditions....starving animals....suffering...cruelty....ENOUGH!!! Shut the f\*\*\*ing pr\*\*k down!!!*

39. Another commenter states:

*I have not been there as I don't live in the USA, but the notoriety of this zoo has spread around the world with information that the animals live in small, squalid, cages that are filthy. The tiger lives in deplorable conditions with a small bowl of filthy water, nowhere to run and stretch, nowhere to swim ( tigers love the water). The Capuchin is so depressed and unhappy that he pulls his fur out, musing to live in a cage - nowhere to climb, run and no others for company. This place needs to be closed down, and it's animals relocated to sanctuaries. To allow it to remain as it is, in intolerable, inhumane and downright cruel.*

40. Upon information and belief, it was PETA that falsely published a story that Dodger, the capuchin monkey at the zoo, pulls his fur out from distress, when that is not the case.

11

41.     Another person, seeing the photograph of the lion as published by PETA, falsely presented by PETA as being thin due to neglect, states as follows, with expletives partially deleted from the original:

*Just saw how skinny your lion is! You disgusting people, what the f--k is the matter with you? You are keeping animals in deplorable conditions, depressed, stressed, under fed, in enclosures that represent hell! For GOD'S sake, shut down and get someone with experience in housing them to come and rescue them and then lock yourselves in the yards and rot! The USDA should take your license away and then you should be put in jail for animal cruelty!!! You vile people!!!*

42.     Plaintiff Robert Candy has further received offensive telephone calls from people reacting to calls by PETA to take action and call the zoo and express their outrage. Given PETA's false statements and misleading commentary, it is small wonder that those persons are often quite abusive to Mr. Candy on the telephone.

43.     In the Summer of 2017, the Defendant PETA filed an Endangered Species Act claim in the United States District Court of Maryland, alleging that Plaintiffs' treatment of the animals constituted "harming or harassing" the animals covered by the Endangered Species Act, namely, two lemurs, five tigers and a lion.

44.     The Federal case proceeds apace, but no matter the outcome of that litigation, the statements that PETA has made publicly about Tri State are false and misleading and give rise to this separate cause of action.

45.     The case filed by PETA in the United States District Court was not filed in good faith. The legal argument is tenuous at best, and during the

course of discovery in that case, PETA has not limited itself to inspection of the tigers, lion, and lemur areas, but insisted on viewing nearly every square inch of the zoo and photographing the same. Their photographer even stuck his camera outside of the fence and took photos of construction debris not on the zoo grounds. There is little doubt these photographs will later be used for further abuse of the Plaintiffs, no matter the outcome of the litigation. The litigation was filed for an improper and extortionate purpose.

46. Upon information and belief, PETA agents have trespassed upon the zoo premises to gather information by fraud, by not disclosing their affiliation with PETA as requested, by entering restricted areas for the taking of photographs, by making secret video and audio recordings, with the audio recordings being a violation of the Maryland Electronic Surveillance Act, and by directly lying to Robert Candy about not having any affiliation with any animal rights group, even while they were making a secret audio recording of conversations with Plaintiff Robert Candy and volunteers at the zoo.

COUNT I
DEFAMATION
All Defendants

47. The Plaintiffs incorporate paragraphs 1 through 46, above, as though set forth fully under this Count.

48. The Defendants made false and defamatory statements about the Plaintiffs, both per se and per quod, with actual malice, without privilege,

and the Plaintiffs have suffered reputational injuries from those false statements, including the following:

    a. By stating that the Plaintiffs failed to feed the animals in their care.

    b. By stating that the Plaintiffs failed to provide water to the animals in their care.

    c. By stating that the Plaintiffs failed to provide veterinary care for the animals in their care.

    d. By stating that the Plaintiffs' animals were distressed, mistreated, and abused.

    e. By implying that the Plaintiffs were directly responsible for the death of the lion Mbube, and falsely stating that the zoo had failed to provide him with veterinary care. The USDA report directly contradicts that statement, noting that the lion was under the care of a veterinarian. The USDA ultimately approved of the course of treatment of the lion and approved of euthanasia when its condition worsened, through no fault of the Plaintiffs.

    f. By stating that the zoo was cited by the USDA for failing to provide veterinary care to an animal when the characterization of the inspection report as a "citation" was false and misleading, and intended to produce public scorn and ridicule against the Plaintiffs.

49. An allegation of animal abuse is an allegation of a criminal act, and is actionable as defamation per se.

50. The statements made by the Defendants were published widely through PETA's website, email lists, and press releases.

51. The statements made by the Defendants were false, and were made either maliciously or negligently.

52. The Defendants had no legal privilege to make the false statements that were made.

53. The statements made by Defendants exposed the Plaintiffs to public hatred, contempt, scorn, and ridicule, and discouraged others from having a good opinion of the Plaintiffs.

54. The Defendants have not retracted or otherwise attempted to mitigate the damages from their false statements.

WHEREFORE, the Plaintiffs pray that this Honorable Court:

A. Enter judgment against all Defendants, jointly and severally, in an amount not to exceed $74,500 (Seventy Four Thousand Five Hundred Dollars), whether actual, punitive, or a combination of the two.

COUNT II
FALSE LIGHT
All Defendants

55. The Plaintiffs incorporate paragraphs 1 through 54, above, as though set forth fully under this Count.

56. As an alternative to Defamation for all of the false statements set forth above, the Defendants have intentionally cast the Plaintiffs in a false light, for all of the reasons stated above, and by doing so, have caused injury to the Plaintiffs' reputations.

57. The actions of Defendants were malicious and without privilege, and were undertaken simply because the Defendants hate the idea of zoos and zookeeping, not because any of the statements made by Defendants were true.

WHEREFORE, the Plaintiffs pray that this Honorable Court:

A. Enter judgment against all Defendants, jointly and severally, in an amount not to exceed $74,500 (Seventy Four Thousand Five Hundred Dollars), whether actual, punitive, or a combination of the two.

## COUNT III
### Tortious Interference with Business Relations/Prospective Advantage
### All Defendants

58. The Plaintiff incorporates paragraphs 1 through 57, above, as though set forth fully under this Count.

59. The Defendants have engaged in tortious interference with the business relations and prospective advantage of the Plaintiffs and have done so maliciously and without privilege.

WHEREFORE, the Plaintiffs pray that this Honorable Court:

    A.    Enter judgment against all Defendants, jointly and severally, in an amount not to exceed $74,500 (Seventy Four Thousand Five Hundred Dollars), whether actual, punitive, or a combination of the two.

### COUNT IV
### Civil Conspiracy
### All Defendants

60.    The Plaintiffs incorporate Paragraphs 1 through 59, above, as though set forth fully under this Count.

61.    The Defendants trespassed by deception, subterfuge, or fraud upon the property of the Plaintiffs and did so without privilege and with malice, in order to obtain information to which they had no right.

62.    The Plaintiff was not fully apprised of the trespass until April of 2018.

WHEREFORE, the Plaintiffs pray that this Honorable Court:

    A.    Enter judgment against all Defendants, jointly and severally, in an amount not to exceed $74,500 (Seventy Four Thousand Five Hundred Dollars), whether actual, punitive, or a combination of the two.

### COUNT V
### TRESPASS
### All Defendants

63.    The Plaintiffs incorporate Paragraphs 1 through 60, above, as though set forth fully under this Count.

64. The Defendants trespassed by deception, subterfuge, or fraud upon the property of the Plaintiffs and did so without privilege and with malice, in order to obtain information to which they had no right.

65. The Plaintiff was not fully apprised of the trespass until April of 2017.

WHEREFORE, the Plaintiffs pray that this Honorable Court:

A. Enter judgment against all Defendants, jointly and severally, in an amount not to exceed $74,500 (Seventy Four Thousand Five Hundred Dollars), whether actual, punitive, or a combination of the two.

### COUNT VI
### FRAUD
### All Defendants

66. The Plaintiffs incorporate Paragraphs 1 through 65, above, as though set forth fully under this Count.

67. All Defendants engaged in fraudulent conduct by entering onto the premises under false pretexts or conspiring to enter onto the premises by false pretext or active deception.

68. Defendants Henstock and Fontes, under the direction and instruction of Defendants Peet and Winders, actively and repeatedly lied to the Plaintiffs in order to gain access to the Plaintiffs' facility, and did so maliciously and with the intention of gaining access for the purpose of harming the Plaintiffs, manufacturing a bad faith complaint against the

Plaintiffs, injuring the Plaintiffs' business interests, and ultimately, for the purpose of defaming the Plaintiffs and attempting to extort the Plaintiffs' property from them.

69. Their actions were undertaken without privilege, with maliciously false statements known to be false at the time, with the intention to deceive the Plaintiffs, and the Plaintiffs did in fact reasonably rely upon the false statements and were deceived by the false statements to their detriment.

WHEREFORE, the Plaintiffs pray that this Honorable Court:

A. Enter judgment against all Defendants, jointly and severally, in an amount not to exceed $74,500 (Seventy Four Thousand Five Hundred Dollars), whether actual, punitive, or a combination of the two.

Respectfully Submitted,

_s/Nevin L. Young_____
NEVIN L. YOUNG
CPF No. 0512150328
170 West Street
Annapolis, Maryland 21401
410-353-9210
nyoung@burlingtonyounglaw.com